# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

E.C., a minor, individually and by and through his parents and next friends, W.C. and K.C.,

       *Plaintiff,*

vs.

Case No. 18-1106-EFM

U.S.D. 385 ANDOVER, *et al*,

       *Defendants.*

## MEMORANDUM AND ORDER

Before the Court are Defendants U.S.D. 385 Andover ("USD 385") and Butler County Special Education Interlocal 638's ("the Interlocal") motions for judgment on the administrative record (Docs. 107 & 109). Plaintiff E.C., by and through his parents W.C. and K.C., brings this action under the Individuals with Disabilities Education Act ("IDEA"), alleging procedural and substantive violations. This case is fundamentally an appeal from two administrative adjudications pursuant to the IDEA. For the reasons stated below, the Court grants Defendants' motions.

## I.     Factual and Procedural Background[1]

E.C. is an 11-year-old boy with a disability who has attended many local schools, oftentimes transferring in the middle of the year.  At one time or another, E.C. has attended New Song Academy, Princeton Children's Center, Holy Cross Lutheran School, Sunflower Elementary School, Meadowlark Elementary School, Prospect Special Day School, Haverhill Special Day School ("Haverhill"), Heartspring Day School ("Heartspring"), Lincoln Elementary School, Andover eAcademy, and Prairie Creek Elementary School ("Prairie Creek").  In particular, E.C. attended Fifth Grade at Prairie Creek in Andover and Haverhill in Augusta.  To accommodate disabled students and provide them with Free, Appropriate Public Education ("FAPE"), USD 385 and other Butler County school districts formed the Interlocal.  Throughout E.C.'s schooling, the Interlocal has developed several Individualized Educational Programs ("IEP") and Behavioral Intervention Plans ("BIP") to attempt to meet E.C.'s special educational needs.

E.C.'s disability manifests itself in aggressive, disruptive, disobedient, offensive, and sometimes violent, behavior.  The Interlocal first formed an IEP and BIP for E.C. on November 19, 2011.  Over time, E.C.'s behavior and school performance failed to improve.  Beginning in 2015, E.C. received educational services from Heartspring.  Unlike prior interventions, these services consistently improved E.C.'s performance in school, reducing the negative manifestations of his disability.  However, beginning in the summer of 2016, Heartspring was no longer able to provide E.C. with full-time educational services under his IEP.  Instead, E.C.'s primary school at the time, Prairie Creek, undertook to carry out the IEP largely by itself, with some weekly

---

[1] The facts are taken from the administrative hearing and are given due weight in this appeal.  In accordance with IDEA judicial review procedures, the Court considers only these facts in making its decision, absent additional proposed and admitted facts at this stage of the proceedings.  Since the Court has not admitted any additional facts, it will proceed upon the record from the administrative hearings below.

assistance from Heartspring staff. After four emergency safety interventions in Fall 2016, Prairie Creek's principal indicated that E.C.'s IEP should be modified and that he should be transferred to Haverhill. Specifically, in October 2016, Prairie Creek called local police after a particularly aggressive instance of E.C.'s misbehavior. The police arrested E.C. and took him to juvenile detention. It was after this arrest that Prairie Creek initiated another IEP modification, transferring E.C. to Haverhill. In October 2016, E.C.'s parents consented to the new IEP and transferred E.C. to Haverhill.

In February 2015, Dr. Laura Turner diagnosed E.C. with autism. Turner does not work for Defendants and was privately consulted by E.C.'s parents. Although E.C. received this medical diagnosis, he did not immediately qualify for an autism exception in the educational setting. E.C.'s parents complained to Defendants about this, requesting that E.C.'s primary exceptionality be labeled as autism. In response, Defendants offered to reevaluate E.C. to update his exceptionality and IEP as necessary, based on an independent evaluation from another physician. E.C.'s parents refused to consent to this reevaluation, so Defendants were unable to move forward with it. Once again, at a later date and after further complaints by E.C.'s parents, Defendants offered to reevaluate E.C. to consider his autism as an exceptionality in his IEP. Yet again, E.C.'s parents refused to consent to a reevaluation. Many witnesses testified that E.C.'s IEP team constructed his plan and provided him services based on his individual needs, which encompassed his autistic behavior, regardless of whether or not autism was specifically listed as one of his exceptionalities.

E.C.'s BIP was one part of his IEP. It identifies E.C.'s problematic behaviors, including: failing to cooperate with authority; physical displays of aggression against teachers, administrators, other students, and himself; property destruction; elopement, which means leaving school grounds without permission during the day; use of inappropriate and explicit language;

consuming non-food items such as hair, dirt, or paint chips; and other general tantrum behaviors. To address these behaviors, the BIP prescribed a progressive sequence of efforts on the part of school personnel. They were expected to first refrain from physical intervention. However, if the behaviors—especially elopement, physical aggression, and self-injury—persisted, they were advised to physically intervene and restrain E.C. to prevent the harmful behavior. There was also a plan in place where E.C. could earn "tickets" for using appropriate language, staying in the classroom, asking for a break, completing his work, and complying with directives. At the hearing, many school employees went into extensive detail about how they implemented each component of the BIP and how they tracked E.C.'s progress in achieving his behavioral goals. They testified that the BIP generally worked very well in addressing E.C.'s misbehavior.

On a few occasions of especially poor conduct by E.C., school personnel failed to perfectly follow the BIP. In one instance on November 1, 2016, E.C. tore posters off of classroom walls and threw computers on the floor. In response, school personnel escorted him to a seclusion area for him to calm down. However, before he was fully calm, Lisa Arndt, Assistant Director of Special Education for the Interlocal, entered the room. After she opened the door, E.C. asked her about another student. Arndt told E.C. that the student had gone home and then E.C. said he wanted to go home too. When Arndt told him he could not, E.C. punched her in the face. Arndt's colleague, Derek Sarkett, had to restrain E.C. to keep him from hitting Arndt a second time. As a result of this altercation, school personnel called police and E.C. was arrested. On other occasions of similar behavior—including one less than a week before, on October 25—school personnel explained to E.C. that if he continued to physically assault them, they would call the police. In those instances, the police were not called and E.C. either calmed down on his own initiative or at the restraint of school personnel.

On January 31, 2017, school personnel escorted E.C. to seclusion after a series of aggressive and disruptive behaviors. While secluded and in view of the school personnel, E.C. began to hit his head against a wall and conduct other self-injurious behavior. The school personnel did not intervene to prevent this conduct. Another event occurred on February 21, 2017. E.C. was playing outside and began pulling on the limbs of a tree, possibly attempting to break them off. Angela Adlesperger, Haverhill's principal, asked E.C. to explain why he was upset. After he replied with explicit language, Adlesperger asked him to come inside. He responded with more explicit language and misbehavior, but eventually calmed down.

E.C. filed this IDEA complaint on March 31, 2017, and a hearing was held by independent hearing officer James Beasley (the "Hearing Officer") over nine days (June 26–28, July 12–13, August 23–24, and September 19–20, 2017). The Hearing Officer considered the following questions: did USD 385 and the Interlocal (collectively the "Districts") deny autism as the primary exceptionality for E.C., resulting in a denial of FAPE?; did the Districts fail to provide appropriate services for E.C.'s autism diagnosis, resulting in a denial of FAPE?; did the Districts fail to implement the behavior intervention plan, resulting in a denial of FAPE?; did the Districts fail to ensure that the IEP provided FAPE?; did the Districts refuse to provide a required IEP amendment?; and lastly, if the Districts failed to provide FAPE, does that entitle E.C. to a residential placement at an undetermined location?

The nine-day hearing produced 2,252 pages of testimony from multiple witnesses for both sides and the Hearing Officer reviewed dozens of exhibits. The Hearing Officer admitted evidence of E.C's educational background as far back as 2011—well beyond the scope of the two-year statute of limitations—for the limited purpose of further understanding E.C.'s pattern of conduct

and Defendants' accommodations.[2]  That evidence was not admitted to support allegations of violations of the IDEA before the limitation period.  The Hearing Officer issued his decision on December 18, 2017, ruling in favor of Defendants on all issues.  The decision is 120 pages long and includes a comprehensive summary of the evidence introduced by both E.C. and Defendants.

E.C. timely filed an appeal with the KSDE on January 17, 2018.  Administrative Law Judge Bob L. Corkins (the "Review Officer") reviewed the Hearing Officer's decision and affirmed it on March 2, 2018.  After properly exhausting all administrative remedies under the IDEA, E.C. filed this Case on April 2, 2018, seeking review and reversal of the IDEA administrative decisions and alleging various violations under other disability statutes.  On April 30, 2019, the Court dismissed all of E.C.'s claims, other than those seeking review of the IDEA administrative decisions.  The only remaining claims are Counts II & III: alleged procedural and substantive violations of the IDEA.

## II.     Legal Standard

Under the IDEA, plaintiffs may seek judicial review of administrative findings.[3]  When reviewing IDEA proceedings, courts do not apply the deferential "substantial evidence" standard typical in the review of administrative proceedings.  Instead, courts must independently decide whether the IDEA requirements have been met under a modified *de novo* standard.[4]  In accordance with this modified *de novo* standard, courts must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision

---

[2] 20 U.S.C. § 1415(f)(3)(C) (two-year statute of limitations); in this case, since E.C. filed the original IDEA resulting in this appeal on March 31, 2017, the Hearing Officer—and resultingly the Review Officer and this Court—had subject matter jurisdiction over actions occurring since March 31, 2015.

[3] 20 U.S.C. § 1415(i)(2).

[4] *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995).

based on the preponderance of the evidence, while giving due weight to the administrative proceedings below."[5] Giving due weight to the administrative proceedings means that reviewing courts must consider the hearing officer's factual findings as *prima facie* correct.[6] The burden of proof in an IDEA case is on the party seeking relief.[7]

### III.     Analysis

E.C. argues that Defendants violated the IDEA both procedurally and substantively.[8] The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."[9] The Court must first consider whether the state complied with IDEA procedures and then determine whether the IEP is reasonably calculated to enable the child to receive a FAPE.[10]

**A.     Count II: Procedural Violations**

E.C. first argues that his procedural rights under the IDEA were violated during the development of his IEP as well as the administrative hearing process. The IDEA includes provisions "to ensure that children with disabilities and their parents are guaranteed procedural

---

[5] *Id.* (internal quotations omitted).

[6] *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

[7] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005).

[8] The Court notes—as have Defendants—that E.C. briefed this motion incorrectly. Instead of submitting his own brief moving for judgment on the administrative record, E.C. merely responded to Defendants' motions, incorporating all of his main arguments as to why the Court should rule in his favor. Because the onus of reviewing the record for procedural and substantive violations in this case falls largely on the Court, the proper briefing procedure—which nevertheless would have been more clear and helpful—is unnecessary in order for the Court to address the merits of the administrative appeal.

[9] 20 U.S.C. § 1400(d)(1)(A).

[10] *Urban v. Jefferson County Sch. Dist. R–1*, 89 F.3d 720, 726 (10th Cir. 1996).

safeguards with respect to the provision of a [FAPE] by such agencies."[11] The primary safeguards provide the parents a right to examine records, participate in meetings, and obtain an independent evaluation of the child's abilities. The parents also have a right to be notified of a proposed change to the child's identification, evaluation, or educational placement, or anything impacting the provision of a FAPE.[12] Lastly, the parents have the right to attempt to resolve the dispute through mediation, and if they cannot, to adjudicate the complaint through an administrative hearing.[13] Importantly, "[t]echnical deviations from the procedural requirements of developing an IEP do not automatically lead to the conclusion that the IEP is invalid."[14] Rather, "there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits."[15]

E.C. has not clearly articulated, in opposition to the present motions, how his procedural rights have been violated.[16] However, based on E.C.'s complaint and prior arguments, the Court deduces that his procedural claim centers on the Hearing Officer's decision to include evidence of E.C.'s educational background before the statute of limitations for only limited purposes.[17]

---

[11] 20 U.S.C. § 1415(a).

[12] 20 U.S.C. § 1415(b)(3).

[13] 20 U.S.C. § 1415(e)-(f).

[14] *Johnson ex rel. Johnson v. Olathe Dist. Sch. Unified Sch. Dist. No. 233, Special Servs. Div.*, 316 F. Supp. 2d 960, 963 (D. Kan. 2003).

[15] *Id*. at 963-64 (citation and quotations omitted).

[16] E.C. raises multiple allegations here that he failed to raise in the administrative proceedings. The Court's subject matter jurisdiction over this review is limited to claims adjudicated by the Hearing and Review Officers. 20 U.S.C. § 1415(f)(3)(B).

[17] E.C. incorrectly colors other claims against Defendants as "procedural violations." The form of this action is a judicial review of the administrative proceedings under the IDEA. This Court can only review those proceedings

After reviewing the administrative record and the Parties' arguments, the Court concludes that E.C. has failed to carry its burden to prove, based on a preponderance of the evidence, that his procedural rights were violated.  The Hearing Officer did not violate the IDEA by admitting evidence of E.C.'s background before the limitations period for only a limited purpose.  Although it is unclear, E.C. seems to argue that both the Hearing Officer and the Review Officer failed to incorporate this evidence in their decisions, both of which held that Defendants provided E.C. with a FAPE.  It was well within the Hearing Officer's discretion to admit evidence of E.C.'s educational background before the limitations period for the sole purpose of further understanding his course of conduct and Defendants' accommodations.  The Review Officer held that no procedural rights were violated by this limited admission of evidence.  Notably, the Review Officer's decision stated:

> Appellant cites several reasons for seeking a broader application of the older records: to be able to "fully develop" its (sic) arguments; to see if respondents fulfilled their obligations; to discern if the current placement is appropriate; to determine what kinds of service and placement E.C. needs, including what has been successful or unsuccessful; and, to see whether the current IEP is reasonably calculated to enable E.C.'s progress. This ALJ finds that none of such expressed objectives by appellant were precluded by the hearing officer's evidence ruling; that is, this evidence restriction did not suppress documented data that was essential to [E.C.]'s case.  [E.C.] was not rendered unable, nor was it even significantly inconvenienced, from making and supporting its arguments with an abundance of other testimonial evidence and more recent documentation.

After reviewing the record and the decision of the Hearing Officer, the Court agrees with the Review Officer and concludes that E.C.'s procedural rights were not violated.  The Hearing

---

for alleged procedural violations.  The Court considers E.C.'s other claims of "procedural violations" against Defendants below, in conjunction with the allegations of substantive violations.

Officer's decision was well within his discretion and it did not negatively impact E.C.'s right to a fair hearing of his claims.

### B.     Count III: Substantive Violations

E.C.'s primary argument is that Defendants substantively violated the IDEA in two ways: by failing to label E.C.'s primary exceptionality as autism, thereby rendering the IEP faulty, and by failing to properly implement his BIP.  A FAPE is provided at public expense, under public supervision and direction, and in conformity with an IEP developed for the child.[18]  The obligation to provide a FAPE does not require a state to "maximize each child's potential."[19]  Rather, "a state [must] develop a personalized instruction plan that allows the child to benefit educationally."[20]  "The IEP is the blueprint for successfully formulating and achieving this goal."[21]  The IDEA also requires states to educate disabled students in the least restrictive environment ("LRE").[22]  "The LRE component of providing a FAPE dictates that the state should integrate a disabled child with non-disabled children whenever possible."[23]  E.C. presents the following two arguments regarding Defendants' failure to provide E.C. with a FAPE.  The Court will address both in turn.

    1.     Failure to Recognize Autism as Primary Exceptionality

First, E.C. argues that Defendants' decision to not recognize autism as E.C.'s primary diagnosis resulted in a faulty IEP and placement.  "The IDEA concerns itself not with labels, but

---

[18] 20 U.S.C. § 1401.

[19] *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 198 (1982); *see also* 20 U.S.C. § 1401(8)(D).

[20] *Johnson,* 316 F. Supp. 2d at 962 (citing *Rowley,* 458 U.S. at 203-04).

[21] *Id.* at 963 (citing *Murray*, 51 F.3d at 925); 20 U.S.C. § 1401(11)).

[22] 20 U.S.C. § 1412(a)(5).

[23] *Johnson,* 316 F. Supp. 2d at 963; *see also* 20 U.S.C. § 1412(a)(5).

with whether a student is receiving a free and appropriate education."[24] The IDEA does not require "that children be classified by their disability, provided a qualifying child is regarded as a child with a disability under [the Act]."[25] "The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the student's] disabilities."[26] The IDEA strongly emphasizes identifying a child's specific needs, not their particular disability, and as such, the "particular disability diagnosis affixed to a child in an IEP will, in many cases, be substantively immaterial because the IEP will be tailored to the child's specific needs."[27]

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[28] "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal."[29] Furthermore, the "IEP must aim to enable the child to make progress."[30] "A focus on the particular child is at the core of the IDEA."[31] The school must

---

[24] *Heather S. v. State of Wis.*, 125 F.3d 1045, 1055 (7th Cir. 1997) (citing *Rowley*, 458 U.S. at 181).

[25] *Lauren C. by & through Tracey K. v. Lewisville Indep. Sch. Dist.*, 904 F.3d 363, 370 (5th Cir. 2018) (citing 20 U.S.C. § 1412(a)(3)(B)) (quotations omitted).

[26] *Heather S.,* 125 F.3d at 1055.

[27] *Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S*., 641 F.3d 996, 1004 (8th Cir. 2011) (citing 20 U.S.C. § 1414(d)).

[28] *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

[29] *Id*.

[30] *Id*.

[31] *Id*.

implement an IEP " 'specially designed' to meet a child's '*unique* needs' through an '[i]*ndividualized* education program.' "[32]

The Review Officer affirmed the Hearing Officer's ruling on this point, noting that "by refusing to consent to the reevaluation, E.C.'s parents are estopped from arguing that E.C.'s designated exceptionality denied him FAPE. Quite simply, the label is immaterial so long as the services needed for E.C.'s individual needs are being addressed by the terms of IEP."[33] The Court agrees. The record clearly shows that Defendants requested multiple reevaluations of E.C. to update and adjust his IEP. W.C. refused to consent to any of those reevaluations. As such, E.C. is estopped from now arguing Defendants failed to properly evaluate his exceptionality. In any case, the particular label attached to E.C.'s exceptionality is irrelevant, so long as the IEP is tailored to adequately address his educational needs.

After reviewing the record and the administrative decisions, the Court affirms the holdings of the Hearing and Review Officers and concludes that E.C.'s IEP was tailored to adequately address his educational needs. Following nine days of testimony and after reviewing dozens of exhibits, the Hearing Officer determined that E.C.'s IEP was constructed to meet his individual needs. Many witnesses, both lay and expert, testified concerning the differences between a medical diagnosis of autism and the IDEA identification of autism. They concluded that, even though E.C.'s primary exceptionality was not listed as autism, his IEP was nevertheless properly constructed to meet his educational needs. The Hearing Officer credited this testimony, concluding that E.C.'s IEP adequately met his individual needs. The Review Officer agreed. After

---

[32] *Id*. (citing and quoting 20 U.S.C. §§ 1401(29), (14)).

[33] Doc. 97-29, p. 2.

further review, the Court affirms those holdings and sees no reason to overturn the Hearing Officer's credibility determination on this matter. E.C.'s IEP contained extensive provisions, including a detailed BIP, and the record shows that the behaviors it sought to address and improve were the same, or substantially the same, as those that witnesses testified are associated with autism. Even though autism was not listed as E.C.'s primary exceptionality, the record amply indicates that his IEP adequately addressed his particular educational needs. Therefore, as to E.C.'s first argument, the Court concludes that E.C. has failed to carry his burden to prove that Defendants violated the IDEA by depriving him of a FAPE.

        2.        Failure to Properly Implement BIP

Second, E.C. argues that Defendants failed to properly implement E.C.'s BIP, thereby denying him a FAPE. The BIP is one element of the IEP. "[T]o prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement *substantial* or *significant* provisions of the IEP."[34] "This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for *material* failures and for providing the disabled child a meaningful educational benefit."[35] Without further guidance from the Tenth Circuit on this standard, the Court proceeds with its analysis under the prevailing "materiality" standard from its sister circuits, giving due

---

[34] *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (emphasis added); *accord L.J. by N.N.J. v. Sch. Bd. of Broward Cty.*, 927 F.3d 1203, 1211 (11th Cir. 2019); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 (8th Cir. 2003); *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 55*, 502 F.3d 811, 822 (9th Cir. 2007); *Sumter Cty. Sch. Dist. 17 v. Hefferman ex rel. T.H.*, 642 F.3d 478, 484 (4th Cir. 2011); *Melissa S. ex rel. Karen S. v. Sch. Dist. of Pitt.*, 183 Fed. Appx. 184, 187 (3rd Cir. 2006).

[35] *Houston Indep. Sch. Dist.*, 200 F.3d at 349 (emphasis added).

weight to the Hearing and Review Officers' conclusions that Defendants' imperfections in implementing E.C.'s BIP did not deprive him of a FAPE.

One other court's construction of a materiality standard for IDEA cases in particular is specifically relevant and persuasive to this Court, absent an explicit standard from the Tenth Circuit.[36] That court and others held that some relevant criterion of materiality include: (1) the failure to implement the BIP cannot be a complete lack of implementation; (2) whatever the variance from the BIP, the imperfect implementation cannot, seen as a whole, deprive the student of a FAPE; and (3) the failed implementation must not substantially interfere with the steady progress of achieving the overarching goals of the IEP.[37] The Court will weigh these factors in reviewing the administrative record concerning Defendants' instances of imperfectly implementing E.C.'s BIP.

E.C. primarily points to the following three occurrences as material deviations from the proper implementation of his BIP. First, on November 1, 2016, E.C. was secluded in a room for destroying classroom property, where he punched Arndt in the face. Second, on January 31, 2017, when school personnel did not intervene to prevent E.C. from banging his head against a wall during one seclusion. Third and finally, on February 21, 2017, E.C. was aggressively pulling limbs off a tree when Adlesperger verbally interrupted him. The Court notes that E.C. provides minimal argument as to why these events show *material* deviations from the BIP, simply pointing to his

---

[36] *See Ross v. Framingham Sch. Comm.,* 44 F. Supp. 2d 104 (D. Mass. 1999) (holding that deviations from the IEP were immaterial), *aff'd*, 229 F.3d 1133 (1st Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001).

[37] *See id.* at 119; *see also Gillette v. Fairland Bd. of Ed.*, 725 F. Supp. 343, 347-48 (S.D. Ohio 1989) (local agency provided FAPE when "significant provisions" of the IEP were followed; failure to provide all services and modifications identified in IEP does not constitute per se violation of IDEA), *rev'd on other grounds*, 932 F.2d 551 (6th Cir. 1991); *see generally* Allan G. Osborne, Jr. and Ralph D. Mawdsley, *When Does The Failure To Implement Terms Of An IEP Result In The Denial Of FAPE?*, 296 ED. LAW REP. 1 (2013).

statement of facts—in some instances little supported by the administrative record—that these occurrences indicate imperfect implementation of the BIP.  The Court will address E.C.'s contentions, giving due weight to the underlying administrative adjudications.

E.C.'s first contention concerning Arndt's entrance into the seclusion room before E.C. was fully calm is without merit.  The record shows that Sarkett was in the seclusion room with E.C., helping to calm him down.  Arndt observed E.C. from outside of the room and based on his apparent calm, proceeded to enter.  E.C.'s BIP delineated the proper response for such situations, prescribing a longer wait-and-see approach until E.C. was fully calm.  In this regard, Arndt's premature entrance into the seclusion room technically violated the BIP.  Her entrance provoked E.C. to attack her, demonstrating that he was not fully calm.  Given the overall context, however, the Court cannot but conclude that the Hearing and Review Officers correctly held that this deviation from the BIP was not a denial of FAPE.  Sarkett himself was in the process of properly implementing E.C.'s BIP, and therefore Arndt's premature entrance cannot be considered a complete lack of implementation of the BIP.  This uncommon variation in the implementation of the BIP cannot be seen as a general denial of FAPE since the overwhelming instances of seclusion properly followed the BIP.  Finally, there is no indication in the record that this occurrence substantially interfered with the steady progress E.C. was making in achieving his IEP goals.  As such, the Court concludes that E.C.'s first argument does not show a material failure to implement his BIP.

E.C.'s second contention concerns the seclusion of E.C. on January 31, 2017.  After E.C. had displayed physical and verbal aggression in class, school personnel secluded him to help him calm down.  During his seclusion, E.C. began to bang his head against the wall.  This occurred within view of Sarkett, who chose not to physically restrain E.C. to prevent him from banging his

head. The BIP addressed such self-injurious behavior by prescribing that school personnel physically restrain E.C. until he was calm and no longer a threat to himself. The Hearing Officer credited Sarkett's testimony that he chose not to perfectly implement the BIP in this instance because he felt it could lead to E.C. inflicting greater harm to himself and others, including Sarkett. In many other instances, however, school personnel regularly intervened to prevent E.C. from self-injurious behavior. Furthermore, in this one instance of Sarkett's deviation from the BIP, E.C. eventually did calm down and his actions did not result in any long-term harm. Taken in context, this failure to perfectly implement the BIP cannot be seen as a complete lack of implementation of the BIP, an overall denial of FAPE, or a substantial interference with the progress toward achieving E.C.'s IEP goals. As a result, the Court concludes that E.C.'s second argument does not show a material failure to implement his BIP.

Lastly, E.C. also points to the incident on February 21, 2017, where he attempted to pull limbs off a tree, contending that Defendants' response was a failure to implement the BIP. In that instance, Adlesperger, Haverhill's principal, stepped outside and noticed E.C. displaying physical aggression towards a tree on school property. According to the BIP, school employees were not supposed to initially engage E.C. when he was damaging property, but they could eventually resort to physically redirecting him as needed. Adlesperger called to E.C. to get his attention, asking him why he was upset. She then requested that he calm down and come inside. Although immediately ineffective, Adlesperger's efforts did eventually calm E.C. down and he stopped destroying school property. Similar to as before, Adlesperger's immediate engagement with E.C. was a technical departure from the BIP. However, the Court concludes that this deviation was also immaterial. Adlesperger could have eventually resorted to physically restraining E.C., as necessary to stop his destruction of school property. The fact that she—on this solitary occasion—decided to verbally

engage with E.C. immediately, rather than wait and observe his course of action, did not constitute an entire failure to implement his BIP, hinder his overall progress in achieving the IEP goals, or otherwise deny him a FAPE. The Court therefore concludes that E.C.'s third and final argument does not show a material failure to implement his BIP.

Ultimately, the Court agrees with the Hearing and Review Officers that the instances where school personnel failed to perfectly implement the BIP were not unique to E.C. and did not represent the typical response to his outbursts. In fact, the record indicates that the Defendants appropriately addressed the vast majority of E.C.'s misbehavior, in accordance with his BIP. Not only were the Defendants' implementation missteps quantitatively insufficient to constitute material departures from the BIP, but they were also qualitatively insufficient. Defendants never entirely disregarded E.C.'s BIP, nor did they ever entirely fail to implement it. Quite simply, E.C. argues that *any* deviation from the BIP constitutes a denial of FAPE. But the current state of the law under the IDEA does not embrace such strict liability. Rather, the Court can only consider material failures to implement the BIP. In the present case, the Court agrees with the Hearing and Review Officers that Defendants' imperfect implementations of the BIP do not amount, overall, to a denial of FAPE. Therefore, as to E.C.'s second argument, the Court concludes that he has failed to carry his burden to prove that Defendants violated the IDEA by depriving him of a FAPE.

## IV.   Conclusion

After reviewing the administrative record and the Parties' arguments, the Court concludes that E.C. has failed to carry its burden to prove, based on a preponderance of the evidence, that he was denied a FAPE. Defendants were not required to label E.C. with the exceptionality of autism, so long as the IEP was designed to provide him appropriate services based on his observed behaviors and disabilities. The Court affirms the Hearing and Review Officers' decisions holding

that Defendants constructed a proper IEP to meet E.C.'s particular circumstances, regardless of how his exceptionality was labeled.  Furthermore, the Court concludes that Defendants properly implemented E.C.'s BIP overall, and that any incorrect implementations were immaterial.  As such, E.C. has failed to show any procedural or substantive violations of the IDEA.

**IT IS THEREFORE ORDERED** that Defendant U.S.D. 385 Andover's motion for judgment on the administrative record (Doc. 107) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Butler County Special Education Interlocal 638's motion for judgment on the administrative record (Doc. 109) is **GRANTED.**

**IT IS SO ORDERED.**

Dated this 27th day of May, 2020.

This case is closed.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE